Constance BAKER, Personal Representative of the Estate of Ricky G. Herron, Plaintiff,

v.

LANE COUNTY, Michael Boggs, Carol John, Ann Marie Hays, Steven C. Goins, Glenn W. Morgan, Reed Kratka, Jeffrey Robbins, and PeaceHealth, a non-profit Washington Corporation, doing business as Sacred Heart General Hospital, Defendants.

No. Civ. 97–20–TC.

United States District Court, D. Oregon.

Jan. 15, 1999.

Michael H. Bloom, Bloom & Spalding, Portland, OR, Thomas F. Spaulding, Thomas F. Spaulding, PC, Portland, OR, for Constance Baker.

David B. Williams, Lane County Counsel, Eugene, OR, for Lane County, Michael Boggs, Ann Marie Hays.

James D. Hibbard, John R. Osburn, Bullivant Houser Bailey Pendergrass & Hoffman, Portland, OR, for Carol John.

Daniel M. Holland, Ronald B. Terzenbach, Loomis & Holland, Eugene, OR, for Steven C. Goins.

Jeffrey M. Kilmer, Pamela J. Stendahl, Kilmer Voorhees & Laurick PC, Portland, OR, for Lane Sheltercare Inc.

## ORDER

COFFIN, United States Magistrate Judge.

Plaintiff's motion (# 195) for a new trial against defendant Lane County is granted for the reasons set forth below.

Ricky G. Herron suffered from schizophrenia, and was under the care of the Lane County Mental Health Division. In late December, 1994, Lane County changed Herron's anti-psychotic medication from Prolixin to Clozaril. Herron agreed to the switch in medication after a discussion of the issue with Carol John, a nurse practitioner who worked full time at Lane County Mental Health.

Herron began medicating with Clozaril on December 27, 1994, pursuant to a standard titration schedule which called for graduated dosage increases over a 15 day period.

Shortly after Herron began medicating with Clozaril, he began exhibiting serious symptoms, possibly from a reaction to the drug. On January 4, 1995, Linet Armstrong, an employee at the residential care facility where Herron was residing, reported to Michael Boggs, Herron's case manager at Mental Health, that Herron was exhibiting "uri-

nary incontinence, speediness, instability." Boggs, a lay person who was untrained and unqualified in medical matters, nonetheless performed the function of a "gatekeeper" at Mental Health, screening the medical needs of clients to determine whether and when they should be seen by a medical professional.

When Boggs received the information about Herron's condition on January 4, 1995, he did not consult with John to determine what the appropriate medical response should be. Instead, according to the contemporaneous notes of Armstrong regarding her conversation with Boggs: "Boggs believes it [the symptoms she had described] may be due to Depakote.[1] Recommends using PRN Vistaril. At this point, wants us to tell Ricky 'Michael [Boggs] strongly suggests you use this.' Is not mandatory use yet. Appointment with Carol John moved from 1/20 to 1/10/95."

Boggs' own notes regarding the January 4, 1995 discussion regarding Herron's symptoms reflect:

"Remains very disorganized. Needs constant supervision. Incontinence being reported. May need med adjustment ASAP."

Boggs was aware that Herron had begun taking Clozaril on December 27, 1994. He further understood that Clozaril was a very strong anti-psychotic drug presenting potentially fatal complications if not monitored properly. And, even as a lay person, Boggs associated the report of Herron's incontinence with the possibility of such being a side effect of the Clozaril.[2]

Despite this knowledge and his own lack of medical expertise, Boggs' reaction to the January 4, 1995, information was only to move Herron's next scheduled appointment to see John up to January 10, 1995, from January 20, 1995, and to advise Herron's caretaker at the residential facility to tell Herron that Boggs strongly suggested that he use PRN Vistaril.

1. Another prescription medication Herron was taking.

2. Boggs testified at trial that he associated the incontinence with the use of Clozaril. On Janu-

At the trial of the case, plaintiff called Dr. Seth Cohen as an expert witness to address issues pertaining to the medical care provided Ricky Herron. When asked about Boggs' response to the January 4, 1995, report about Herron's condition, Cohen testified as follows:

That's not okay. It's ... far worse than not okay. This is ... a medical emergency. This is a deterioration of an individual who had no history of incontinence, who was incontinent, who has significant mental status deterioration, and requires medical attention. And it's my understanding, from reading the deposition, that Mr. Boggs is not a trained medical professional. This is not okay for a nontrained medical professional to make a determination that this deterioration was from Depakote. It wasn't from Depakote. And I ... I think that it is completely below the standard of care for a nonmedical care professional to make that determination, and then to go on to make a suggestion about what medicine to use. Vistaril is sort of this nonspecific sedating medicine, which sort of makes people relax a little bit.

This was a scenario where the appropriate response, the prudent treatment routine would have been for Mr. Boggs to say, "I've got to talk to my doc about this." Mr. Herron is in need of medical attention now. And this is not okay. His ... failure to proceed that way led to the ongoing deterioration. The Clozaril kept getting bumped up. It's wrong. (Tr. 10/28/98, pages 66–67).

As indicated by Dr. Cohen, the dosage of Clozaril administered to Herron was being regularly increased pursuant to the titration schedule during the period after the report of Herron's incontinence and other symptoms on January 4, 1995.

On January 9, 1995, the staff at the residential care facility reported to Boggs that Herron's incontinence was worsening and that his thought associations were bordering on "word salad," [i.e., incomprehensible].

ary 4, 1995, however, according to Armstrong's notes, he told her that he believed it was from the drug Depakote.

On this occasion, Boggs did relate the information from the care facility to Nurse John, who associated the problem of incontinence with Lithium (another prescription drug Herron was taking) and directed that the Lithium be discontinued.

The following day, January 10th, Herron arrived at the Mental Health office for his appointment with John. His condition was such that he was promptly admitted to Sacred Heart Hospital. Herron eventually died on January 27, 1995. An autopsy determined the cause of death was myocarditis, or inflammation of the heart muscle. Dr. Cohen testified that the Clozaril caused Herron's myocarditis and Dr. Samuel Vickers, the pathologist who testified regarding the autopsy findings, agreed that the myocarditis was "most likely due to some hypersensitivity reaction to a drug, possibly Clozaril."

The effect of the delay in providing appropriate medical care to Herron after his symptoms were described to Michael Boggs was critical according to Dr. Cohen, who opined that had Herron been seen by a qualified medical professional on January 4, 1995, the Clozaril would have been discontinued and he would have recovered from his reaction to it.[3]

Lane County failed to offer credible evidence to rebut Dr. Cohen's testimony that the failure to have Herron examined by a competent medical professional on January 4, 1995, fell below the standard of care owed Herron in monitoring and treating him after putting him on Clozaril. Carol John, who was not timely informed about the events of January 4th, responded on cross-examination that had she been so informed "I would look at that and say I should see him as soon as you can." Although Dr. Paul Helms, the medical director of the Lane County psychiatric hospital, testified that he believed Boggs acted reasonably in simply moving Herron's appointment up to January 10th when he received the January 4th report, his testimony in that regard was very vague. For one thing, Helms never clearly opined that it would have been reasonable for a qualified medical professional to have waited almost a week to examine an incontinent patient who had just recently had a medication change to Clozaril, as opposed to whether such was a reasonable reaction on the part of an unqualified lay person. For another, part of Dr. Helms' opinion was based upon his interpretation of Linet Armstrong's notes to the effect that Herron's behavior "really was not as pronounced as described by Mr. Boggs." At the least, it seems contradictory to suggest that Boggs acted reasonably [in only scheduling an appointment for the next week] because Herron's condition wasn't perceived by others to be as serious as Boggs apparently believed. Next, Dr. Helms stated, without much elaboration, that although Herron's incontinence was "something of importance," he did not "think there was any indication to have a medical care professional see him on that particular day."

Another point implicitly made by Lane County through the testimony of Dr. Helms is that it would not have mattered had Boggs referred Herron to a qualified medical professional. Thus Dr. Helms testified that it was reasonable to continue Clozaril after January 4th because Herron's symptoms did not require the discontinuation of the Clozaril and that side effects—even "important" ones such as incontinence—do not necessarily implicate a discontinuance of the drug. Of course, Michael Boggs was not qualified to make any such decision [regarding the continuance of Clozaril], and thus Dr. Helms' opinion on that subject has to find support in one of two possible assumptions: 1) that had a qualified medical professional been immediately informed about Herron's symptoms the

---

3. Herron's medical picture, as it was impacted by Clozaril, was complicated. Cohen testified that on January 4, 1995, Herron was suffering from NMS—Neuroleptic Malignant Syndrome—which was caused by the Clozaril and which is separate and distinct from myocarditis, which Cohen testified was also caused by the Clozaril. Although Cohen conceded that he did not know when Herron contracted myocarditis and thus could not express an opinion on whether Her-

ron's heart would have become inflamed even had the Clozaril been discontinued on January 4th, he emphatically expressed that the continued administration of Clozaril and the strengthening of its dosage for almost a week after he began evidencing the described symptoms was an inappropriate response to his condition, and that Herron would not have died had he received proper and immediate medical care on January 4th.

professional would not have promptly examined Herron and would have continued him on the same medication while waiting approximately a week to examine him; or 2) that a prompt examination by a qualified professional would have revealed nothing to warrant treatment or alteration of the medication.

The first assumption is not supported by the evidence. Even Nurse John admitted that she would have wanted to see Herron as soon as she could had she known of his incontinence on January 4th. Dr. Helms did not directly contradict this and, as noted above, his testimony was quite vague on the issue of whether a qualified medical professional, as opposed to a lay person, would have acted reasonably in reacting as Boggs did on January 4th. Nonetheless, even if his testimony on the whole may be construed as an expert opinion that a reasonably competent medical professional would have met the standard of care owed a patient on Clozaril exhibiting incontinence by waiting six days to examine him while continuing and strengthening the dosage of Clozaril, he did not offer much in the way of an explanation for that opinion.

The only alternative ground for Dr. Helms' opinion that the continuation of Clozaril was reasonable would be the assumption that a prompt examination by a competent medical professional would not have disclosed anything warranting a different course. Such an assumption would seem to be speculative. According to Dr. Cohen, a proper response would have been for a medical professional to have obtained vital signs (temperature, pulse, blood pressure), run basic blood tests, and conduct other appropriate exams. Cohen opined that the prudent physician would have diagnosed NMS, and immediately discontinued Clozaril.

I recognize, however, that Dr. Cohen's diagnosis of NMS was disputed at trial, and

that the medical testimony offered by the defendants [4] was to the effect that NMS is a difficult diagnosis, and that medical experts disagreed over the criteria for a diagnosis of NMS. To make the issue more complicated, Dr. Cohen opined that Clozaril-induced NMS is an *atypical* form of the syndrome, and there is even less consensus among the experts as to the criteria for an atypical NMS diagnosis.

■ Be that as it may, what Lane County must defend here is the lack of any professional diagnosis at all on January 4, 1995, as opposed to a diagnosis that may or may not have been consistent with Dr. Cohen's and, even if not, may still have comported with reasonable medical care standards. What is clear from the facts of this case is that Lane County failed to meet the standard of care in monitoring and treating Ricky Herron by having an untrained lay person screen his medical condition and, for all practical purposes, make the medical judgment that Herron should continue treatment with Clozaril despite his January 4th symptoms.[5] For that reason, I find the jury's verdict in this case to be against the clear weight of the evidence, and accordingly grant the motion for a new trial. *See Rattray v. City of National City,* 51 F.3d 793 (9th Cir.1994); *Venegas v. Wagner,* 831 F.2d 1514 (9th Cir. 1987); *Hanson v. Shell Oil Co.,* 541 F.2d 1352 (9th Cir.1976).

■ As an alternative ground, the court also finds that a new trial is warranted because of error in admission of evidence during the trial that Herron was exhibiting dangerous sexual proclivities and was perceived to be a threat to rape one of the staff at the care facility.

Throughout this action, plaintiff objected to the admission of such evidence on the grounds that it was irrelevant and highly

---

4. Plaintiff also sued Dr. Steven Goins, a physician who treated Herron after his admission to the hospital, on the theory that Goins failed to properly diagnose and treat Herron's NMS. The jury found for Dr. Goins, and plaintiff's motion for a new trial is directed only against defendant Lane County on plaintiff's negligence claim.

5. The County argues that employees without medical expertise commonly screen individuals

for medical needs, e.g., a jailer determining whether a person appearing intoxicated needs to "sleep it off" or needs to see a doctor. However, this case is different in that the County had prescribed the strong anti-psychotic medication Herron was taking, and therefore had a duty to exercise reasonable care in monitoring and treating him after doing so.

prejudicial. When pressing for the relevance of the sexual misconduct evidence, the court understood county counsel's position to be that evidence would be forthcoming that Herron's sexual ideation was a factor in continuing him on Clozaril after the symptoms of an adverse reaction emerged. [See discussion in chambers on October 27, 1998, set forth in exhibit A and attached to plaintiff's memorandum (# 196) in support of motion for new trial]. Accordingly, evidence of Herron being a potential threat to staff and the community was admitted for the limited purpose of explaining Lane County personnel's state of mind in continuing him on Clozaril notwithstanding his symptoms.

But the connecting evidence never materialized. No witness related that Herron's alleged sexual misconduct played any part in the decision to continue him on Clozaril after January 4th. As set forth previously, no medical professional was even informed of Herron's symptoms on January 4th. Nurse John, informed of his symptoms on January 9th, did not testify that her instructions to discontinue Lithium (while continuing Clozaril) were based upon any consideration of the patient's sexual proclivities. Whether Michael Boggs took such into consideration was irrelevant—he did not have the qualifications to make a judgment on Herron's medical care. At any rate, not even he testified that his reaction to the January 4th report of Herron's symptoms was influenced by the evidence pertaining to the sexual misconduct. In sum, there was never any fit between this evidence and any decision by Lane County to continue Herron on Clozaril.

Over and above the failure of Lane County to make the proffered fit, there was unrebutted testimony by Dr. Cohen that "Clozaril is not a medicine to treat aberrant sexual behaviors or drives."

Lane County contends that evidence of Herron's misconduct was relevant to put his treatment in context, i.e., to demonstrate the need to have administered Clozaril in the first place.

I disagree. The essence of plaintiff's case was focused upon the monitoring and care of Herron after he began medicating with Clozaril. Although plaintiff did contend that Lane County failed to obtain informed and voluntary consent from Herron in connection with the drug's use, that issue concerned whether Nurse John adequately explained the risks of the drug, other options, and whether Herron's consent was vitiated by the threat of returning him to institutional confinement (at the state psychiatric hospital) if he did not use the medication.

The consent issue did not mandate the admission of evidence pertaining to Herron's sexual and other misconduct. Herron suffered from a severe psychiatric disorder. Carol John testified that treatment of his disorder with Prolixin was not working, and thus a decision was made to switch antipsychotic medications. As noted, plaintiff never challenged the decision to prescribe Clozaril, but only the procedures used to obtain his consent. The articulation of specific bad acts on the part of Herron had little, if any, relevance to whether he voluntarily consented to take Clozaril. Had this court understood at the trial that the sexual misconduct and other crimes evidence was being offered on the issue of consent, I would have excluded the evidence after balancing its probative value against the danger of unfair prejudice. Fed.R.Evid. 403; Fed.R.Evid. 105. Because this court understood that the thrust of plaintiff's case was the continued administration of Clozaril and the monitoring of Herron after he began exhibiting symptoms while on the drug, and that Lane County's position was that this "other crimes" evidence was relevant to show why Lane County continued him on this treatment notwithstanding the symptoms, the evidence was admitted for that limited purpose.[6] That purpose was never proven. The prejudicial

---

**6.** The court does not fault defense counsel for this misunderstanding. A reading of the entire colloquy between counsel and the court reflects that there was a certain evolution during the discussion. Initially the court agreed with Lane County counsel that the misconduct was relevant to the County's treatment plan. Plaintiff's counsel then interjected that plaintiff was not contesting the reason the County gave Herron Clozaril, but the monitoring of him afterwards. The court then asked county counsel to respond. Counsel replied:

> To stop the medication at the time they're saying the symptoms appear would not have been without cost. It was highly effective with regard to the tremor. It appeared, at least

nature of the erroneously admitted evidence warrants a new trial. *People of Territory of Guam v. Shymanovitz,* 157 F.3d 1154 (9th Cir.1998); *United States v. Merino–Balderrama,* 146 F.3d 758 (9th Cir.1998).

█ Finally, the County opposes plaintiff's motion on the ground that the jury could have found that this action was time-barred. The County maintains that plaintiff should have filed a tort claim notice within one year of Herron's death. Herron died on January 27, 1995, and this action was filed on January 7, 1997.

The applicable standard governing the beginning of the one year limitation period was set forth in the following jury instruction:

The one year limitation period on giving a tort claim notice to Lane County did not begin to run until after the plaintiff knew or in the exercise of reasonable care should have known facts which would make a reasonable person aware of a substantial possibility that each of the following three elements of a claim existed:

(1) That Mr. Herron was harmed;

(2) That defendant Lane County's actions or inactions were a substantial factor in causing all or part of Mr. Herron's harm; and

(3) That defendant Lane County's actions or inactions were wrongful.

initially, to be reducing the sexual ideation he has having.

.        .        .        .        .

THE COURT: They're saying their awareness of the background is part of the reason they responded the way they responded when he exhibited these symptoms, so how do you take that out of the case?

Although Mr. Herron died on January 27, 1995, the clear weight of the evidence indicates that plaintiff did not receive any notice that would cause a reasonable person to be aware of all three elements of a claim until October 30, 1996, when she received a letter from one David Oaks (attached as exhibit 1 to this Order). The tort claim notice was timely filed well within a year of receipt of this letter. Prior to being informed that an "eyewitness" existed who had information that Herron "had many serious physical complaints that were ignored [by Lane County] before his death," plaintiff was only on notice that Herron was harmed, not that Lane County's actions were wrongful or a substantial factor in that harm. *See generally Stephens v. Bohlman,* 314 Or. 344, 838 P.2d 600 (1992).

Plaintiff's Motion (# 195) for a New Trial is granted. Defendant Lane County's Motion (# 192) for attorney fees related to plaintiff's § 1983 claim is denied. Although the § 1983 claim was the subject of a successful directed verdict motion, it cannot be said that the claim was frivolous, unreasonable, or without foundation. *See Christianburg Garment Co. v. E.E.O.C.,* 434 U.S. 412, 421–22, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); pages 6–8 of plaintiff's response (# 198), incorporated herein by this reference.

Thus, it appears that what may have happened is that the County thought the evidence was relevant to Herron's treatment plan, while the Court had, in light of plaintiff's concession, moved past that point and admitted the evidence for a much narrower purpose that never materialized.

October 30, 1996

**Support Coalition International**

Constance W. Baker
#706
915 NE Schuyler
Portland, OR 97212

454 Willamette, Suite 216
P.O. Box 11284
Eugene, OR 97440-3484
USA

    Re: Ricky Herron

Phone: (541) 345-9106
Fax: (541) 345-3737
E-mail: cencron@efn.org
Web Site: www.efn.org/~cencron

Dear Ms. Baker:

Support Coalition is a human rights group advocating for psychiatric patients.

First, let me express our condolences and concern and support for you and your family over the loss of your son last year. Soon after Ricky's death on Jan. 27, 1995, we were alerted by a mental health worker that there seemed to be major problems. We waited for Lane County to do an investigation. But they never did.

We started our own investigation, and we're very concerned. There were several problems involving your son's death that deserve greater attention than has been given. We found an eye-witness who has agreed to speak out that Ricky was given a powerful psychiatric drug against his will, and that he had many serious physical complaints that were ignored in the time before his death. Also, after Sacred Heart's autopsy, Lane County never did an investigation. Finally, it appears from the Sacred Heart report that a significant factor in Ricky's death was a side effect of that drug he was given involuntarily. This side effect is called "Neuroleptic Malignant Syndrome" (NMS), and there are indications this is what he developed.

We have spoken about this in front of the Lane County Board of Commissioners, Lane County Mental Health Advisory Board, and Lane County Human Rights Commission. The County Commissioners mandated this morning that Lane County request an outside investigation, by the federally-funded Oregon Advocacy Center.

It's important that I speak with you or another family member soon. Can you please phone me at our Eugene office at (541) 345-9106? Thank you.

In support,

David Oaks, co-coordinator

**EXHIBIT**
_1_

"An international alliance defending human rights and promoting alternatives for psychiatric survivors."